2019 IL App (1st) 181492

No. 1-18-1492

Opinion filed September 23, 2019

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 17 CR 1274601 |
| | ) | |
| TERRENCE DAVIS, | ) | Honorable |
| | ) | Domenica Stephenson, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Lavin and Justice Pucinski concur in the judgment and opinion.

**OPINION**

¶ 1   Police officers found a firearm under Terrence Davis's driver's seat while conducting an inventory search incident to impounding Davis's car, and they charged him with several firearm offenses. Davis filed a motion to suppress the firearm. The trial court granted Davis's motion, finding that the officers improperly impounded the car. The State filed a certificate of impairment and appealed, arguing that the trial court erred because state law required the officers to impound Davis's car after he admitted to driving with a revoked license and could not provide proof of insurance. Davis contends that impoundment was improper, as the officers failed to request he show them proof of insurance. We affirm.

¶ 2                                    Background

¶ 3      During a routine patrol. Chicago police officer Jamel Pankey saw Terrence Davis waiting to turn left and talking on his cell phone. Pankey followed Davis and pulled up next to him. Pankey warned Davis about talking on his phone while driving. Davis complied, stopped talking on his phone, and drove away.

¶ 4      Officer Jordan Smith, Pankey's partner, told Pankey that he recognized Davis from their daily briefing about people of interest in the area. Smith knew Davis's name and date of birth and entered it into the onboard computer system. Smith learned that Davis's driving license had been revoked.

¶ 5      About 30 minutes later, both Smith and Pankey stood outside their car. Pankey was talking to a person who flagged them down on an unrelated matter. Smith saw Davis driving slowly on Morgan Street and waved to him to pull over. Davis parked in front of the officers' car and walked up to Smith. Pankey joined the conversation. They told Davis that his license was revoked and he was not permitted to drive. At that time, Davis failed to produce either a valid driver's license or valid insurance card.

¶ 6      Chicago police Sergeant Dennis O'Keefe, also on patrol, noticed Smith and Pankey had stopped Davis. O'Keefe went to help Smith and Pankey. Smith told O'Keefe that they had seen Davis driving and knew his driver's license had been revoked. O'Keefe asked Davis if he had a valid license; Davis said he did not. O'Keefe told Smith and Pankey to arrest Davis for driving with a revoked license. The officers handcuffed Davis, put him in the back of a squad car, and took him to the police station.

¶ 7     Several unknown men offered to move the car. O'Keefe told them they could not take an uninsured car. One man started walking quickly towards the car, but O'Keefe got to Davis's car first and drove it to the police station. At the station, O'Keefe conducted an inventory search. During the search, O'Keefe recovered a firearm from under the driver's seat.

¶ 8     Davis was charged with several firearm offenses and moved to suppress, which the trial court granted, finding insufficient evidence to show that the car was parked illegally. During argument on the State's motion to reconsider, the State pointed the court to the Illinois Vehicle Code and argued, "if you look at transcript pages 36 and 54, that the defendant did not provide them with any valid insurance for the vehicle" requiring that "the vehicle shall be immediately impounded." The trial court denied the motion to reconsider, finding, again, that the car was "legally parked" and that the court "didn't hear any testimony that it was required to be impounded, that was pursuant to any type of statute or ordinance or anything like that." The State timely filed a certificate of impairment.

¶ 9                                     Analysis

¶ 10    The State challenges the trial court's ruling on four grounds: (i) the officers had reasonable suspicion to conduct a *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)); (ii) the officers had probable cause to arrest Davis after he admitted to driving with a revoked driver's license; (iii) the officers properly impounded Davis's car for driving with a revoked license and no proof of insurance; and (iv) the inventory search was proper. Davis only responds to the State's third argument, contending that the impoundment violated section 6-303(e) of the Illinois Vehicle Code (Code) (625 ILCS 5/6-303(e) (West 2016)) when the officers did not request Davis to produce proof of insurance. See *id.* § 7-602.

¶ 11    When reviewing a trial court's ruling on suppression of evidence, the trial court's factual findings receive great deference and will only be reversed when against the manifest weight of the evidence. *People v. Nash*, 409 Ill. App. 3d 342, 346 (2011). Since the parties do not dispute the facts, we review *de novo* the trial court's legal conclusion on suppression of the evidence. *Id.* at 346-47.

¶ 12    An inventory search is "a judicially created exception to the warrant requirement of the fourth amendment." *Id.* at 348. To be valid, an inventory search must satisfy three criteria: (i) the original impoundment of the vehicle must be lawful; (ii) the purpose of the inventory search must be to protect the defendant's property, to protect the police against allegations of theft or damage, or to protect the police from danger; and (iii) the inventory search must be conducted in good faith and not as a pretext for an investigatory search. *Id.* (citing *People v. Hundley*, 156 Ill. 2d 135, 138 (1993)). Determining whether impoundment is proper presents "[t]he threshold issue." *Id.*

¶ 13    The State argues the Code requires officers to impound uninsured vehicles driven by drivers with revoked or suspended driving privileges. To address the State's argument, we interpret the statutory language, a task we undertake *de novo*. *Id.* at 349. We give the statute's language its plain and ordinary meaning, as that provides the best way to "ascertain and give effect to the intent of the legislature." *Id.* (citing *People v. Donoho*, 204 Ill. 2d 159, 171 (2003)). If the language is clear and unambiguous, we apply it as written. *Id.*

¶ 14    The Code states that "any person who drives or is in actual physical control of a motor vehicle on any highway of this State at a time when such person's driver's license *** is revoked or suspended *** shall be guilty of a Class A misdemeanor." 625 ILCS 5/6-303(a) (West 2016).

Further on, the Code says: "Any person in violation of this Section who is also in violation of Section 7-601 of this Code relating to mandatory insurance requirements *** shall have his or her motor vehicle immediately impounded by the arresting law enforcement officer." *Id.* § 6-303(e). When we turn to the Code's insurance requirements, we read: "No person shall operate *** a motor vehicle designed to be used on a public highway unless the motor vehicle is covered by a liability insurance policy." *Id.* § 7-601(a).

¶ 15    Missing from these statutory provisions is a discussion about the quantum of evidence necessary to establish either that the driver is invalidly licensed or lacks proof of insurance. As Pankey explained, to determine whether a driver is licensed, officers have access to the Secretary of State database on their squad car's computer. Nothing in the record indicates a similar database for insurance coverage.

¶ 16    Further reading in the Code provides some guidance: "Every operator of a motor vehicle subject to Section 7-601 of this Code shall carry within the vehicle evidence of insurance," which "shall be displayed upon request made by any law enforcement officer ***. Any person who fails or refuses to comply with such a request is in violation of Section 3-707 of this Code." *Id.* § 7-602. Failure to comply with a request to produce proof of insurance under section 7-602 presumptively deems a person "to be operating an uninsured motor vehicle." *Id.* § 3-707(b). The plain language, in accordance with common sense, sets up an expectation that an officer will ask for proof of insurance and the driver will provide it.

¶ 17    We agree with the State that the Code does not require officers to ask a driver for proof of insurance. The only mandatory language in section 7-602 directs drivers to comply with a request if an officer makes one. Also notably absent from the Code, however, is a requirement

placed on a driver to affirmatively provide proof of insurance to the officer absent a request to do so—unless an officer requests proof of insurance, the presumption that a driver's car is uninsured (*id.*) does not apply. We cannot think of a scenario in which an officer would be able to learn about a car's insurance coverage without asking *someone* for proof of insurance (the driver or the car's owner) or having that information volunteered to them. The State has cited no authority for the proposition that drivers must volunteer proof of insurance without an officer's request.

¶ 18    The State argues that *Nash* is "directly on point." We disagree. The officer in *Nash* "*asked* defendant for her driver's license and proof of insurance." (Emphasis added.) *Nash*, 409 Ill. App. 3d at 344. The defendant then admitted that she had neither her license nor her insurance card on her. *Id.* There is no similar evidence here. Pankey's only testimony about insurance came from the following exchange during the State's cross-examination:

"Q. Okay. And after telling the defendant that his driver's license was revoked what, if anything, did the defendant say to you.

A. At this time I just related that—so much was all chaotic. You know I wasn't sure if it was or if it wasn't. And that was the most part. That was it.

Q. Was the defendant able to produce to you a valid driver's license?

A. No, he was not.

Q. Or any valid insurance for the vehicle that he was just driving?

A. No."

The only other testimony about insurance in the rest of the record came from the State's cross-examination of Smith:

"Q. But in your presence did you hear your sergeant tell the defendant why he was pulled over?

A. Did my sergeant? Yeah, my sergeant briefly asked do you have— should you be driving. And [Davis] stated no or [the sergeant] said are you suspended or he said do you have a license. [Davis] said I'm either suspended or revoked.

Q. Okay. Did defendant ever produce to you or your partner that day a valid driver's license?

A. No, ma'am.

Q. Did he produce to you or your partner any proof of insurance for the vehicle he was driving?

A. No, ma'am."

Did Davis fail to produce proof of his insurance after the officers requested it? Or did Davis fail to spontaneously produce proof of insurance? If the former, impoundment would undoubtedly have been proper. If the latter, we run into at least two problems. First, as we have said, the Code does not punish a driver for failing to spontaneously show an officer his or her insurance. Second, Davis's interaction was not an ordinary traffic stop. Davis, by contrast, walked over to the officers after they flagged him down; he was not "pulled over" in the way we typically think of an ordinary traffic stop. There was no reason for Davis to assume that the officers had traffic-related inquiries. So there would have been much less incentive for Davis to volunteer proof of insurance absent a request by the officers.

¶ 19    The State argues in its reply brief that "the implicit (yet obvious) premise is that [Davis] was unable to produce [his license and proof of insurance] after being asked by the officer." According to the State, "the phrasing of the questions to Officer Pankey shows that they were based on his having actually made such a request [for proof of insurance]." We disagree, and this leads us to the burden of proof.

¶ 20    The State presents the law accurately. On a motion to suppress, the defendant bears the initial burden to make a *prima facie* case of the unlawfulness of the challenged police action. *People v. Brooks*, 2017 IL 121413, ¶ 22. If the defendant successfully establishes the factual and legal basis for suppression, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case. *Id.* The ultimate burden of proof then rests with the defendant. *Id.*

¶ 21    The State, however, attempts to overlay this standard legal framework on the facts, but it does not fit. The testimony that the State points to and that we set out above (*supra* ¶ 18) was part of the State's cross-examination during Davis's case-in-chief. Taking all of this evidence into account, the trial court *then* denied the State's motion for a directed finding. In other words, the trial court found that the officers' testimony, including their testimony that Davis "failed to produce" proof of insurance, made out a *prima facie* case of unconstitutional police action. Only after the trial court's denial of the State's motion for a directed finding did the burden shift to the State. *People v. Relwani*, 2019 IL 123385, ¶ 17 (only if "defendant makes a sufficient *prima facie* showing, thereby avoiding a directed finding, the burden will shift to the State to come forward with evidence in rebuttal" (internal quotation marks omitted)); see also *People v. Aleliunaite*, 379 Ill. App. 3d 975, 978 (2008) (defendant's failure to establish *prima facie* case warrants directed finding in State's favor).

¶ 22    Once the burden shifted to the State, by virtue of the trial court's denial of its motion for a directed finding, the State told the court: "State has no witnesses. We rest." The State provided no further evidence, as was its burden at that point, giving any more meaning to the ambiguous testimony that Davis "failed to produce" proof of insurance. Clearing up this ambiguity was critical because, as we have discussed, the consequences differ markedly depending on what "failed to produce" means. *Supra* ¶ 19. Were we to supply additional meaning to the phrase "fail to produce," we would be speculating, and that is inappropriate. See *In re Marriage of Johnson*, 245 Ill. App. 3d 545, 554 (1993) ("A reviewing court is not free to ignore evidence which supports the judgment of the trial court and to rely instead upon speculation in order to reverse."). The State's cross-examination of Sergeant O'Keefe shows that the State could elicit the information in its proper form when asking about Davis's license:

> "Q. Did you have the opportunity to inquire of the defendant if he had a
>
> valid driver's license?
>
> A. Yes.
>
> Q. And did you have a conversation with him at that time?
>
> A. Yes.
>
> Q. What, if anything, did he tell you about his driver's license?
>
> A. He told me he did not have one."

Had the State asked identical questions of the witnesses about Davis's proof of insurance, we would not be confronted with an ambiguity. The State failed to meet its burden to rebut Davis's *prima facie* case that the impoundment was unlawful given the lack of evidence that he did not have proof of insurance.

¶ 23    We do not mean our opinion to cast aspersions on the police. The officer may have acted appropriately, but the record does not adequately show what happened during the officers' interaction with Davis. As we have said, the trial court shifted the burden to the State, and the State failed to meet it. By failing to ask about whether officers asked Davis for his insurance, the State has left us with a record that does not allow us to say the trial court erred; we will not read between the lines as the State urges.

¶ 24    At oral argument, the State emphasized what, in its view, is a lack of factual findings by the trial court on the question of whether Davis lacked proof of insurance. The State also insisted that the trial court's conclusion that the car was legally parked and could have been driven away was an erroneous *legal* conclusion. We disagree. The State's written motion to reconsider and argument on the motion made express reference to the Vehicle Code's requirement of impounding an uninsured car driven by an invalidly licensed driver. The trial court "read the State's motion to reconsider" and "reviewed [its] notes" from the suppression hearing. The trial court's findings, that the car was legally parked and could have been driven away by others present at the scene, have a critical factual premise baked in—the car was insured or, at least, there was insufficient evidence that Davis lacked proof of insurance.

¶ 25    We have previously held—in a case cited in the State's brief no less—the absence of evidence that an officer asked anyone to produce an insurance card is insufficient to prove a violation of the Code. *People v. Merritt*, 318 Ill. App. 3d 115, 117 (2001). We acknowledge the higher burden of proof the State contended with in *Merritt*, but speculation is speculation whatever the burden. The trial court linked its ruling to the facts presented in the testimony and

concluded that the law, presented twice over by the State, did not require impoundment. That ruling was not error.

¶ 26    Affirmed.

---

**No. 1-18-1492**

---

| | |
|---|---|
| **Cite as:** | *People v. Davis*, 2019 IL App (1st) 181492 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-1274601; the Hon. Domenica Stephenson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Joseph Alexander, Assistant State's Attorneys, of counsel), for the People. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Marc E. Gottreich, of Gottreich Grace & Thompson, of Chicago, for appellee. |

---