# Illinois Official Reports

## Appellate Court

---

**_People v. Montes_, 2020 IL App (2d) 180565**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GILBERTO MONTES, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-18-0565 |
| Filed | June 24, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 15-CF-928; the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and James K. Leven, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BRIDGES delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Brennan concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant, Gilberto Montes, was convicted of unlawful possession of 900 grams or more of a substance containing cocaine, with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2014)). On appeal, he argues that (1) the trial court erred in denying his motion to suppress evidence because his arrest was not supported by probable cause, (2) his unconstitutional arrest vitiated his consent to search his home and requires suppression of the evidence found therein, under the fruit of the poisonous tree doctrine, and (3) if his defense counsel failed to preserve the issue of probable cause to arrest, counsel provided ineffective assistance. We affirm.

¶ 2                                              I. BACKGROUND

¶ 3        On January 27, 2016, defendant was charged in a two-count indictment. Count I charged him with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2014)), a Class X felony. It alleged that on June 12, 2015, defendant knowingly and unlawfully possessed with intent to deliver 900 grams or more of a substance containing cocaine. Count II charged defendant with unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(D) (West 2014)), a Class 1 felony, based on the same allegations, minus intent to deliver.

¶ 4                                          A. Motion to Suppress

¶ 5        On March 30, 2017, defendant filed a motion to quash arrest and suppress evidence.[1] He argued in the motion that "the arresting officers had no warrant for [his] arrest and were not authorized under any provision of the law to affect such an arrest." He further argued that the police improperly searched his residence without a warrant or permission. A hearing on the motion took place the same day.

¶ 6        We summarize defense counsel's opening argument on the motion to suppress. On the date in question, defendant was stopped by Department of Homeland Security (Homeland Security) investigators though he was not committing any crime or engaging in any unlawful activity at the time. After the officers placed defendant in custody, they learned that he was in the country illegally. Counsel stated that this was "really not one of the issues in the case at this point, but [he] guess[ed] it [was] a sub-issue." The officers then searched defendant's vehicle and house, without a warrant or consent, violating his fourth amendment rights.

¶ 7        Defendant provided the following testimony. On June 12, 2015, he lived at 1075 Lisa Boulevard in Aurora. At about 11 a.m., he drove in his pickup truck with his dog to a Walgreens store and bought some items. When he exited the store, a man stopped him and told him that he was from Homeland Security. He asked if defendant was "Flores," and defendant said no. The officer asked another question, and defendant said that he could not answer because he did not speak English. An officer who spoke Spanish joined them and three or four unmarked police vehicles arrived. All of the officers wore civilian clothing. They asked defendant for

_____

[1]One appellate court panel has stated that "motion to quash arrest" is an arcane phrase that is essentially meaningless verbiage and that such a motion should instead be titled "motion to suppress evidence," as that is the motion's goal. *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 28. We will therefore refer to the motion here as simply a motion to suppress evidence.

identification, and, when he showed them his identification, they said that it was "garbage." Defendant wanted to go to his truck to let his dog out, but the officers did not allow him to leave. The officers said that they had a warrant for his arrest for selling marijuana and that he was under arrest. They searched his truck without asking for permission but did not find anything.

¶ 8 Defendant's identification listed his address as 609 Lake Street in Aurora, which was his previous address. An officer said that defendant did not live there anymore and that they were going to defendant's current residence, at 1075 Lisa Boulevard. Defendant asked if they had a "permit or permission to go in," and the officer said, " 'No. It's okay.' " An officer drove defendant's truck to his house and parked it there. Defendant was handcuffed and traveled in another car. There were about 8 to 10 police cars already at the house. The police were going to kick in the door, but then an officer asked if a key he was holding was defendant's house key. Defendant said yes, but he did not give the police permission to go in. The police never showed defendant a warrant, and they did not ask him to sign any documents.

¶ 9 Sergeant Detective Montague Hall testified as follows. He was a task force officer in the narcotics group of Homeland Security. He was also a sergeant with the Waukegan Police Department. He spoke Spanish in addition to English, and he used Spanish in about 85% of his work encounters.

¶ 10 On June 12, 2015, Hall was investigating defendant in Hall's capacity as a task force officer with Homeland Security. "Information was given" to them that defendant was dealing narcotics and laundering money back to a Mexican cartel. The informant provided a name and phone number, which led the officers to defendant. Hall admitted that the investigation synopsis did not identify the subscriber of the phone number. The officers looked up defendant in the "system" and found out that he had previously been under investigation for cannabis smuggling and money laundering. Eric Powell, an immigration officer assigned to the narcotics group, determined that defendant was in the United States illegally.

¶ 11 Hall and Officer James Lindley conducted surveillance on defendant in Aurora. They were wearing plain clothes and in an unmarked police car, but Hall wore a bulletproof vest that said "Police." The officers saw defendant make several trips to a Bank of America branch and then saw him go into a Walgreens. When defendant exited the Walgreens, Hall and Lindley approached defendant on foot. They were off to the side of the parking lot, and they were not next to defendant's vehicle. Hall spoke to defendant in Spanish. He identified himself and asked defendant if he was Gilberto Montes. Defendant said yes, and Hall asked him for identification. Neither officer told defendant to stop or asked if his name was Flores. However, in his testimony, Hall admitted that he was conducting an investigatory stop and that defendant was not free to leave. Defendant's identification listed his address as 609 South Lake Street. Hall told defendant that he was under investigation for being in the country illegally. Powell then arrived, and he verified that defendant was in the country illegally. Neither officer said that defendant's identification was "garbage" or that he did not live at 609 South Lake Street.

¶ 12 Hall then took defendant into custody and advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Hall placed defendant in handcuffs and told him that he was under investigation for cannabis smuggling and money laundering. Hall also told defendant that they believed that he was selling cannabis from his house. Defendant said that he lived at 1075 Lisa Boulevard. He said that he had no cannabis in the house and that the police could check the house if they wanted to. To clarify, Hall asked defendant if the police could go to his

house and check, and defendant replied in the affirmative. Hall therefore believed that defendant gave verbal consent to search the residence. They placed defendant in the backseat of Powell's car and drove there. The officers asked if defendant wanted to leave his truck at Walgreens, and he requested that they bring it back to the residence because his dog was inside. The officers did not search the vehicle at the time, but they later searched it and found marijuana.

¶ 13　　At the house, the three officers and defendant walked up to the front door. Defendant showed Hall which key opened the door, and they went inside. The officers found money and narcotics ledgers in a hidden compartment in the bathroom and two kilograms of cocaine hidden underneath a chair.

¶ 14　　During the hearing, Hall identified a consent-to-search form used by Homeland Security and testified that he or another agent might have had such a form with them during the encounter with defendant. He did not use a form with defendant because defendant gave verbal consent to search the house. The form used specific language regarding consent and informed the signatory that he had a right to refuse. When using the form, Hall would write his own name where it stated, "ICE special agent," list the property, and require the individual's signature. The acknowledgement in the form stated, "I hereby voluntarily and intentionally consent to allow ICE to search my property" and noted that the consent was freely given.

¶ 15　　We summarize defense counsel's closing argument on the motion to suppress. The State did not meet its burden. A form documenting voluntary consent is specific and unique, and the officers' failure to use one showed that the search was not done in the proper manner. The officers obtained defendant's statement that they could "check" the house, but that statement was ambiguous. Nothing in the record indicated that defendant understood his rights, including that he had the right to refuse to consent. The failure to document his consent should indicate to the court that defendant was not consenting freely and voluntarily. Counsel concluded by stating, "at this point, we're only talking about the search of the home, the Court should suppress the evidence that was encountered inside the home."

¶ 16　　The trial court stated:

> "The court finds that the officers had done an investigation prior to this particular date and that the Department of Homeland Security held the belief that the defendant was in the United States illegally.
>
> The court further finds that the officer made a legal stop on the defendant in the parking lot at the Walgreens; that the officers placed him into custody and read the defendant his *Miranda* rights."

The trial court continued as follows. Hall's testimony was very credible and believable. There were only three officers with defendant. The officers searched defendant's house without a search warrant or signed consent. However, defendant gave verbal consent for the search while he was in the Walgreens parking lot, after being informed of his *Miranda* rights. Therefore, the trial court denied defendant's motion to suppress.

¶ 17　　　　　　　　　　　　　　B. Bench Trial

¶ 18　　A bench trial took place on September 28, 2017. We summarize the testimony of Lindley. On June 12, 2015, he was working as a task force officer "with the Chicago narcotics group at Homeland Security investigations." He and Hall approached defendant in the Walgreens

- 4 -

parking lot. Lindley said only "hi" or "hello" because he did not speak Spanish; Hall communicated with defendant in Spanish. After conversing with defendant, Hall informed Lindley that he had obtained permission from defendant to search defendant's residence, so they proceeded to 1075 Lisa Boulevard. Lindley walked up to the front door with Hall and "Agent Paul." Hall had a conversation with defendant, in which Hall showed defendant a key, and Hall then opened the door.

¶ 19   The residence contained two bedrooms and a bathroom. The police found $15,100 and "books" hidden under the bathroom sink. In the northwest bedroom, they found two brick-like objects hidden under a piece of wood on the bottom of a chair. The parties stipulated that the objects consisted of a substance containing cocaine that weighed a total of 999.8 grams. Based on Lindley's training and experience, he estimated the street value of the cocaine at between $100 and $120 per gram. A user typically purchased 3.5 grams at the higher end, which was called an "8-ball," or purchased 1 or 2 grams at the lower end. Therefore, a typical user would not have 999.8 grams of cocaine. The street value of the cocaine was $236,000.

¶ 20   The closet in the northwest bedroom had male clothing, but less than a typical amount. The closet also contained a foreign driver's license and a Bank of America document with defendant's name, both of which listed the 609 South Lake Street address. The police also found defendant's birth certificate in the bedroom.

¶ 21   There was a minimal amount of female clothing in the southwest bedroom, but no female personal care products in the bathroom. In the basement, the police found items commonly used in distributing narcotics and for money laundering, namely a "FoodSaver" machine and "FoodSaver" bags (which Lindley stated are "utilized to place amounts of narcotics or money into a plastic bag and then all the air is sucked out, so it compresses it, and it's easy to be delivered or concealed"), a bag of rubber bands, a box of gallon-size "slider" bags, and green plastic wrap. A Jeep was inside the one-car garage. The Jeep's title was on the kitchen counter, and it listed the owner's name as a female with a different address. The Jeep had a hidden compartment activated by pistons, but police found only a towel inside. The house as a whole had "minimal items" and there were not basic things like a kitchen table.

¶ 22   An officer testified that a narcotics-sniffing dog alerted to a truck outside the house, to one of the bedrooms, to underneath the bathroom cabinet, and to the floorboard of the back hatch of the Jeep.

¶ 23   In addition to testifying consistently with his testimony from the hearing on the motion to suppress, Hall further testified as follows. He had been employed with the Waukegan Police Department since 2001 and by Homeland Security since 2007. After defendant produced his identification outside of the Walgreens, Hall advised him that there was an investigation in reference to him dealing in cannabis and money laundering from his house on 1075 Lisa Boulevard. Defendant denied engaging in these activities and said that the police could go there and check.

¶ 24   Hall testified to the items recovered from the house, specifying that a notebook found under the sink was determined to be a ledger. The only furniture in the northwest bedroom was a bed and a chair. Hall went outside and asked defendant about the money found in the bathroom, and he "said it was the girls [*sic*] who lived at the house." He said that a woman resided there but was currently in Mexico. Defendant said that he slept in the northwest bedroom and that all of his clothes were there. When confronted about the cocaine that the police found, defendant said that he did not know about the cocaine and that it was not his. He said that he

was a landscaper and was not involved in narcotic sales. Hall never returned to the property to speak to any female. Also, the police did not find any cannabis for distribution at the house.

¶ 25    The trial court found as follows. The State's witnesses were very credible and very believable. There was substantial evidence tying defendant to the address that was searched, including a birth certificate, banking documents, and other documents. The documents included defendant's name, and some included his picture. Although the documents listed a different address, they were found at the location that the police searched, in close proximity to the contraband and currency. Further, defendant had a key to the premises, and he gave it to the officers so that they could conduct the search, which they did with his consent. The cocaine weighed over 900 grams, a volume someone in the cocaine trafficking business would typically possess, as opposed to a user. The trial court found defendant guilty beyond a reasonable doubt of both counts.

¶ 26    After the trial court made its ruling, the parties and the trial court agreed to extend the time for defendant to file a posttrial motion to November 1, 2017. On that date, the trial court continued the hearing to November 2, 2017.

¶ 27    On November 2, 2017, defendant filed a motion for a new trial, in which he included the argument that the trial court erred in denying his motion to suppress. A hearing on the motion took place on March 21, 2018. Defense counsel argued, among other things, that they "had early alleged that it was an illegal arrest, but [he thought that] the fact that the defendant didn't have any immigration status in the United States probably vitiate[d] that argument, so [he would] turn to the next step." Counsel then argued that defendant was not presented with a written consent-to-search form, nor was his verbal consent to search recorded in any manner. Counsel also argued that there was no direct or circumstantial evidence that defendant knew about the cocaine hidden in the chair. The trial court denied the motion for a new trial.

¶ 28    On June 22, 2018, following a sentencing hearing, the trial court ruled that count II merged into count I. It sentenced defendant to 15 years' imprisonment, which was the statutory minimum, followed by 3 years' mandatory supervised release. The trial court also imposed various costs, fines, and fees. Defendant timely appealed.

¶ 29                                II. ANALYSIS

¶ 30    On appeal, defendant first argues that the trial court erred in denying his motion to suppress evidence. At a hearing on a motion to suppress, the defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure. *People v. Brooks*, 2017 IL 121413, ¶ 22. Where the defendant was searched and seized without a warrant, he may make his *prima facie* case by showing that he was doing nothing unusual or suspicious to justify the police in taking such action without a warrant. *People v. Carter*, 2019 IL App (1st) 170803, ¶ 18. If the defendant meets this burden, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case. *People v. Davis*, 2019 IL App (1st) 181492, ¶ 20. Still, the ultimate burden of proof remains with the defendant. *Id.*

¶ 31    When reviewing a ruling on a motion to suppress, we defer to the trial court's factual findings and reverse those findings only if they are against the manifest weight of the evidence. *People v. Hill*, 2020 IL 124595, ¶ 14. Such deference is based on the recognition that the trial court is in a superior position to determine and weigh the witnesses' credibility, observe their demeanor, and resolve conflicts in their testimony. *People v. McDonough*, 239 Ill. 2d 260, 266 (2010). However, we review *de novo* the ultimate legal ruling on the motion to suppress. *Hill*,

2020 IL 124595, ¶ 14. Moreover, in reviewing the trial court's ruling on a motion to suppress, we may consider evidence presented at both the suppression hearing and the trial. *People v. Hood*, 2019 IL App (1st) 162194, ¶¶ 38-39.

¶ 32 Defendant argues that, even though he and Hall offered contradictory testimony at the hearing on the motion to suppress, he accepts Hall's version of events for purposes of appeal, meaning that we should review *de novo* the legal conclusions derived from Hall's testimony. We therefore accept Hall's version of events as true for purposes of this appeal.

¶ 33 On the merits, defendant maintains that he was arrested when the police handcuffed him and read him his *Miranda* rights. Defendant argues that he presented evidence that he was not doing anything unusual when the police arrested him and that they lacked a warrant, which shifted the burden to the State to prove that there was probable cause for the arrest. See *People v. Grant*, 2013 IL 112734, ¶ 11 (an arrest without a warrant is valid only if it is supported by probable cause to arrest). Defendant notes that the State took the position that defendant was arrested for being in the United States illegally and that the trial court found that defendant was lawfully seized in the parking lot for this reason. Defendant argues, however, that the police lacked probable cause to arrest him, because his being in the United States illegally was not a crime.

¶ 34 Defendant cites *Arizona v. United States*, 567 U.S. 387, 407 (2012), where the Supreme Court stated:

"As a general rule, it is not a crime for a removable alien to remain present in the United States. See *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent."

Defendant also cites two cases that cited *Arizona*. In *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015), the court stated, "unlawful presence in the country is not, without more, a crime." In *Parada v. Anoka County*, 332 F. Supp. 3d 1229, 1243 (D. Minn. 2018), the court stated, "It is clearly established that a warrantless arrest must be supported by probable cause of criminal activity, that unlawful presence is not a crime, and that an immigrant's possible removability is insufficient to give rise to probable cause."

¶ 35 Defendant additionally argues that, regardless of whether illegal presence in the United States is generally sufficient to establish probable cause, the State failed to meet this burden. Defendant notes that probable cause to arrest exists if the arresting officer knows facts that would be sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. See *Grant*, 2013 IL 112734, ¶ 11; see also 725 ILCS 5/107-2(1)(c) (West 2014). Defendant also notes that the probable cause inquiry is based on an objective analysis, as opposed to the subjective beliefs of the officer (see *People v. Lee*, 214 Ill. 2d 476, 484-85 (2005)), and that a mere hunch or suspicion is not enough (see *People v. Drake*, 288 Ill. App. 3d 963, 967 (1997)). Defendant argues that whether the officers had a subjective belief that he was in this country illegally is not relevant but that, rather, the State needed to and failed to show that the officers had knowledge of objective facts to show a probability that he had committed a crime. Defendant argues that Hall's testimony regarding the investigation of defendant's alleged drug dealing and money laundering was insufficient, as the testimony was based on just a hunch or suspicion and the State presented no objective facts to show that he was involved in any narcotics enterprise. Defendant highlights that, in any event, his alleged drug trafficking was not used by the police or the State as a basis for probable cause for his

arrest. Defendant then proceeds to argue that his unconstitutional arrest vitiated his consent to search his home and requires suppression of evidence found therein, under the fruit of the poisonous tree doctrine.

¶ 36    The State's initial reply is that defendant failed to make a *prima facie* case on his motion to suppress, because defendant testified that the officers had a warrant to arrest him. The State's argument is without merit, as defendant testified that the officers told him that they had a warrant for his arrest for selling marijuana. The officers never claimed in their testimony that they actually had a warrant to arrest defendant, and Hall's testimony indicated that he arrested defendant for being in the country illegally.

¶ 37    The State next argues that the initial encounter between the officers and defendant was consensual or was a proper stop under *Terry v. Ohio*, 392 U.S. 1 (1968). However, regardless of how the initial encounter can be labeled, it is clear that defendant was arrested when he was handcuffed and read his *Miranda* rights, and the issue here is whether Hall had probable cause to arrest him. Defendant met his burden of making a *prima facie* case by showing that he was not doing anything unusual at the time of his warrantless arrest. *Carter*, 2019 IL App (1st) 170803, ¶ 18. Therefore, the burden shifted to the State to produce evidence justifying the intrusion. *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 23.

¶ 38    The State argues that any error in the trial court using defendant's immigration status as a basis to find probable cause for arrest was invited error because, at the hearing on defendant's motion for a new trial, defense counsel argued that they "had early alleged that it was an illegal arrest, but [he thought that] the fact that the defendant didn't have any immigration status in the United States probably vitiate[d] that argument, so [he would] turn to the next step." The State argues that, having conceded defendant's lack of immigration status in the United States and the fact that it impaired the validity of his argument, defendant procured the trial court ruling that he now charges as error. The State cites *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 24, where the court stated that the doctrine of invited error or acquiescence is a form of procedural default or estoppel that provides that a party may not request that the court proceed in one manner and then argue on appeal that the requested action was error.

¶ 39    The State alternatively argues that the officers' reasonable suspicion of criminal activity developed into probable cause. It argues that the officers had information that defendant was engaged in drug smuggling and money laundering, that the officers saw defendant engage in the unusual activity of going to the bank several times in one day, and that defendant's multiple addresses, as shown by an address on his identification that was different from that with which he was associated, showed that it was more probable than not that defendant was engaged in money laundering. The State argues that once defendant provided his identification and Hall had reasonably trustworthy information from Powell that defendant was in the United States illegally, there was evidence to establish that it was more probable than not that defendant committed a federal criminal immigration offense and/or a money laundering offense and to provide probable cause to arrest defendant. See 8 U.S.C. § 1325 (2012) (unlawful entry); 8 U.S.C. § 1326 (2012) (unlawful reentry). The State argues that, even under suspicion of an alien being removable, the officers, working for Homeland Security and in conjunction with an immigration officer, had the authority to make a warrantless arrest of defendant where he was likely to escape before a warrant could be obtained (see 8 U.S.C. § 1357(a)(2) (2012)), especially since there were multiple addresses attached to defendant.

¶ 40 The State argues that *Arizona* is inapposite because the statute at issue in that case addressed the ability of local officers to make arrests for removability under civil immigration law, rather than for criminal immigration violations. The State points out that the United States Supreme Court stated in *Arizona* that it was not addressing whether a federal immigration crime would be a legitimate basis for prolonging detention. *Arizona*, 567 U.S. 387 at 414-15. The State cites subsequent cases distinguishing arrests for civil removability from arrests for federal criminal immigration offenses. It maintains that the officers in this case had the implicit authority to arrest suspects for federal offenses, including violations of criminal immigration laws. The State argues that *Arizona* is further distinguishable because here members of a Homeland Security task force were working alongside an immigration officer.

¶ 41 We conclude that defendant's actions in the trial court preclude him from arguing on appeal that the officers lacked probable cause to arrest him for an immigration violation. Section 114-12(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-12(b) (West 2016)), which includes requirements for motions to suppress, states: "The motion shall be in writing and state facts showing wherein the search and seizure were unlawful. The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant." In *Ramirez*, the court stated:

> " 'A motion to suppress is, in effect, a pleading to the extent that it frames the issues to be determined in a pretrial hearing on the motion. The fundamental role of a pleading is to give an opposing party notice of the pleader's position concerning the facts and law so that the opposing party can begin to prepare his defense. A pleading thus both defines and limits the areas of consideration at a trial or other evidentiary hearing ***, by enabling the court to determine the relevance of offered evidence.' " *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 60 (quoting *State v. Johnson*, 519 P.2d 1053, 1057 (Or. Ct. App. 1974)).

¶ 42 Here, defendant argued in his motion to suppress that "the arresting officers had no warrant for [his] arrest and were not authorized under any provision of the law to affect such an arrest." Defendant made no specific mention of the officers lacking probable cause to arrest for his being in the country illegally. Because defendant's motion to suppress did not specify the immigration issue as a reason to suppress evidence, defendant did not give the State notice regarding what his position was as to the facts and the law such that it could prepare a full defense, contrary to the principles discussed in *Ramirez*, 2013 IL App (4th) 121153, ¶ 60.

¶ 43 In opening argument at the hearing on the motion to suppress, defense counsel argued that the officers learned that defendant was in the country illegally after they placed him in custody. Counsel characterized the immigration issue as "really not one of the issues in the case at this point, but [he] guess[ed] it [was] a sub-issue." More significantly, after hearing testimony that the police learned of defendant's illegal status before arresting him, in closing argument counsel abandoned the subject by not even mentioning the immigration issue as a reason to grant the motion to suppress. In fact, counsel did not address probable cause for arrest as a disputed point. Rather, he focused entirely on the issue of defendant's consent to search the home, saying, "at this point, we're only talking about the search of the home, the Court should suppress the evidence that was encountered inside the home."

¶ 44 Had defendant properly set forth the issue in the trial court, the State could have explored it further through more specific questioning of witnesses, both at the hearing on the motion to suppress and at trial. See *Hood*, 2019 IL App (1st) 162194, ¶¶ 38-39 (in reviewing the trial

court's ruling on a motion to suppress, we may consider evidence presented at both the suppression hearing and the trial); see also *People v. Hughes*, 2015 IL 117242, ¶ 38 ("new factual theories on appeal deprive the formerly prevailing party of the opportunity to present evidence on that point").

¶ 45 Adding to this, at the hearing on the motion for a new trial, defense counsel conceded the argument by stating that they "had early alleged that it was an illegal arrest, but [he thought that] the fact that the defendant didn't have any immigration status in the United States probably vitiate[d] that argument, so [he would] turn to the next step." We agree with the State that this concession amounts to invited error. Under the invited error doctrine, a defendant cannot complain of error that he or she induced the trial court to make, or to which he or she consented. *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 52. In other words, because counsel conceded that the officers had probable cause to arrest defendant for being in the country illegally, defendant cannot complain on appeal that the trial court erred in denying the motion to suppress on this basis. See also *Hughes*, 2015 IL 117242, ¶ 38 (the defendant's posttrial motion and argument on that motion was not sufficient to give the trial court any indication that the focus was the issue the defendant later asserted on appeal).

¶ 46 Defendant cites *People v. Heider*, 231 Ill. 2d 1 (2008), for the proposition that defense counsel adequately preserved the issue in the lower court. There, the question was whether the defendant had preserved for review his argument that the trial court improperly considered his mental impairment as an aggravating factor in sentencing. *Id.* at 18. The supreme court stated that the purpose of requiring an objection in the trial court is to give the trial court the opportunity to review the defendant's claim and save the expense and delay of an appeal if the claim is meritorious and to prevent the litigant from asserting on appeal an objection that is different from the one he raised below. *Id.* Our supreme court concluded: "In circumstances such as these, where the trial court clearly had an opportunity to review the same essential claim that was later raised on appeal, this court has held that there was no forfeiture." *Id.*

¶ 47 Defendant asserts that he preserved his argument because his motion to suppress evidence argued that the arrest was illegal and the trial court found that the officers properly arrested him for being in the United States illegally.

¶ 48 Defendant's argument is not persuasive.[2] Again, defendant did not specify in his motion to suppress that he believed that the officers lacked probable cause to arrest him for being in the country illegally. Defense counsel briefly raised the subject in his opening argument at the hearing on the motion to suppress, but he then abandoned the issue by not even referencing it in closing argument, instead arguing only about the consent to search. The trial court mentioned defendant being in the United States illegally as a basis for the arrest, but it was stated in passing, as opposed to being discussed as a disputed point. Unlike in *Heider*, because defendant failed to sufficiently assert his argument, the State could neither question witnesses more in depth about the subject at the hearing on the motion to suppress and at the trial nor call

[2]In conjunction with defendant's ineffective assistance of counsel argument, the State does not contest that defendant alerted it to his argument that his arrest was unauthorized; the State instead relies exclusively on the invited-error doctrine. However, courts of review are not bound even by a party's concession (*People v. Carter*, 2015 IL 117709, ¶ 22), and we conclude that defendant failed to sufficiently raise the issue of lack of probable cause to arrest him for being in the United States illegally, in addition to later inviting the alleged error.

additional witnesses such as Powell, thus resulting in an incomplete record on the question. The situation is additionally distinguishable from *Heider* because here defense counsel further conceded the argument by stating at the hearing on his posttrial motion that they "had early alleged that it was an illegal arrest, but [he thought that] the fact that the defendant didn't have any immigration status in the United States probably vitiate[d] that argument, so [he would] turn to the next step."

¶ 49    As our supreme court stated in *Hughes*, 2015 IL 117242, ¶ 46:

> "By declining or failing to raise these claims below, defendant deprived the State of the opportunity to challenge them with evidence of its own, he deprived the trial court of the opportunity to decide the issue on those bases, and he deprived the appellate court of an adequate record to make these determinations. To consider such claims preserved would also multiply litigation by motivating parties to address at trial all conceivable arguments that might later be made and by forcing the trial court to consider not only the arguments made by counsel, but all arguments counsel might have made."

See also *People v. Pettis*, 2016 IL App (4th) 140469, ¶ 27 (the defendant forfeited his argument on appeal about reasonable suspicion where he did not make the argument in his motions to suppress or in his oral argument to the trial court at the suppression hearing). Accordingly, we conclude that defendant did not adequately preserve for review and further conceded the issue of whether the officers had probable cause to arrest him for being in this country illegally.

¶ 50    Based on this resolution, we do not address defendant's argument that his unconstitutional arrest nullified his consent to search his home and required suppression of evidence found therein, under the fruit of the poisonous tree doctrine.

¶ 51    Recognizing that we might conclude that he did not adequately preserve the issue of probable cause for review, defendant alternatively argues that defense counsel was ineffective for failing to do so. For a claim of ineffective assistance of counsel, a defendant must satisfy the two- pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption that trial counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice. *People v. Valdez*, 2016 IL 119860, ¶ 14. In most situations, this is done by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *Id.* However, where the claim of ineffectiveness is based on counsel's failure to file a motion to suppress, the defendant must establish prejudice by showing that the unargued suppression motion was meritorious, meaning that it would have succeeded, and that there is a reasonable probability that the trial outcome would have been different had the evidence been suppressed. *People v. Henderson*, 2013 IL 114040, ¶¶ 12, 15. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 52    Defendant contends that a lack of probable cause based on his illegal presence in the United State would have been a meritorious argument if defense counsel had raised the issue in the trial court because illegal presence is not a crime and because the police did not have objective facts that would cause a reasonably cautious person to believe that he was in the country

illegally or that he committed a crime. According to defendant, counsel could have successfully argued that the police used the unlawful arrest and surrounding circumstances to exploit him into giving consent to search his home, rendering the consent involuntary. The trial court would have then suppressed the illicit fruits of the unlawful arrest and warrantless search, being the cocaine and other incriminating evidence found within the home. Defendant further contends that the State would not have had any evidence to obtain a conviction, such that the charges against him would likely have been dismissed. Defendant argues that we should therefore reverse his convictions and vacate his sentence outright, without remand for a new trial.

¶ 53    The State argues that defense counsel did file a motion to suppress arguing that the arrest was unauthorized and that, though he later invited the error now raised on appeal, defendant's ineffective assistance argument does not address the invited error, thereby resulting in forfeiture of the issue on review. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). The State asserts that, even otherwise, defendant cannot show ineffective assistance of counsel because the motion would have been futile in that the police had probable cause to arrest defendant for a crime, as the State previously argued. See *supra* ¶¶ 40-41.

¶ 54    Defendant responds that *Arizona* does not make the civil-criminal distinction urged by the State. He argues that local law enforcement did not have the authority to arrest him for being in this country illegally because such enforcement usurps the federal statutory scheme, which usually requires the Attorney General to issue a warrant to authorize an arrest. Defendant contends that, even if the State's criminal-civil distinction carries weight, the State did not show that the police had probable cause for a reasonably cautious person to believe that he committed a federal criminal immigration law violation. Defendant argues that the record reveals no objective facts known to the officers to suggest that he committed a federal criminal offense but, rather, only a belief that he was in this country illegally.

¶ 55    If the State is correct that the officers had probable cause to arrest defendant for drug smuggling and money laundering, our inquiry would end here. However, we conclude that there was not sufficient evidence of such crimes to amount to probable cause. The officers received a tip from an informant, but probable cause cannot be based on an uncorroborated tip from an unidentified informant, even where the tip specifically identifies an individual. *People v. Wise*, 2019 IL App (2d) 160611, ¶ 59. Defendant had previously been under investigation for cannabis smuggling and money laundering, but this would amount to only suspicion of a crime. The fact that he made multiple trips to the bank and that he had an old address on his driver's license would not lead a reasonably cautious person to believe that he had engaged in drug smuggling or money laundering.

¶ 56    As such, we turn to whether the officers had probable cause to arrest defendant for being in the United States illegally. Defendant relies exclusively on *Arizona* in answering this question in the negative. At issue in *Arizona* was whether four separate provisions of Arizona state law were preempted by federal immigration law. *Arizona*, 567 U.S. at 394, 398. One provision gave state and local law enforcement officers the authority to arrest a person without a warrant if the officers had probable cause to believe that the person had committed a public offense that made him removable from the country. *Id.* at 394. The United States Supreme Court stated that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States. [Citation.] If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Id.* at 407. It stated that, under the federal statutory structure, the attorney general may issue a warrant for an arrest, and, where

no federal warrant has been issued, federal officers have more limited authority. *Id.* at 408. For example, they may arrest an alien for being in the United States in violation of any immigration law or regulation, but only where the alien is likely to escape before the warrant can be obtained. *Id.* The Court stated that the Arizona law attempted to provide state officers with "even greater authority to arrest aliens on the basis of possible removability than Congress [had] given to trained federal immigration officers." *Id.* The Court therefore concluded that this provision of the Arizona law was preempted by federal law. *Id.* at 410.

¶ 57    In arriving at its conclusion, the Court acknowledged that there was a federal statute permitting state officers to cooperate with the Attorney General to identify, apprehend, detain, or remove aliens not lawfully present in the United States. *Id.* (citing 8 U.S.C. § 1357(g)(10)(B) (2012)). It stated that Homeland Security gave examples of what would constitute cooperation under federal law, which included "situations where States participate in a joint task force with federal officers." *Id.* The Court stated that, although there might be some ambiguity as to what constituted cooperation under federal law, it would not "incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.*

¶ 58    Thus, even on its face, *Arizona* is distinguishable from the situation here, as *Arizona* involved state and local officers attempting to unilaterally enforce civil immigration violations of federal law. In contrast, Hall and Lindley were working as task force officers of a narcotics group with Homeland Security, and the group also included an immigration officer. Hall additionally testified that, had he used a Homeland Security consent to search form, he would have written his name where it stated "ICE special agent"; this could indicate his involvement with immigration enforcement. At a minimum, the officers' work with Homeland Security could arguably fall into the type of cooperation with the federal government mentioned as permissible in *Arizona*. Defendant does not acknowledge this distinction or cite authority further discussing the subject. See *People v. Bailey*, 2019 IL App (3d) 180396, ¶ 22 (a reviewing court is not a repository into which an appellant may foist the burden of argument and research, nor is it our function or obligation to act as an advocate, and the failure to clearly define issues and support them with authority results in forfeiture of the argument).

¶ 59    Further, there is support within *Arizona* for the State's argument that *Arizona* was addressing only civil immigration violations, as opposed to criminal immigration violations. While discussing another provision of the Arizona law, the Court stated in *Arizona* that there was "no need in this case to address whether reasonable suspicion of illegal entry or another immigration crime would be a legitimate basis for prolonging a detention, or whether this too would be pre-empted by federal law." *Arizona*, 567 U.S. at 414. The Fourth Circuit has stated: "Lower federal courts have universally—and we think correctly—interpreted *Arizona v. United States* as precluding local law enforcement officers from arresting individuals solely based on known or suspected *civil immigration violations*." (Emphasis added.) *Santos v. Frederick County Board of Commissioners*, 725 F.3d 451, 464 (4th Cir. 2013). As *Arizona* dealt exclusively with civil immigration violations, there is support for the proposition that even local law enforcement agencies may enforce criminal immigration-related laws. See, *e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012); *Macareno v. Thomas*, 378 F. Supp. 3d 933, 942 (W.D. Wash. 2019); *Davila v. Northern Regional Joint Police Board*, 370 F. Supp. 3d 498, 546 (W.D. Penn. 2019) ("It has been long-settled that local law enforcement agencies may enforce *criminal* immigration violations, but lack the authority to enforce civil violations."

(Emphasis in original.)). Although defendant argues that the record does not show that the officers had information that he committed a federal criminal immigration offense, this is because defendant did not sufficiently raise the issue in the trial court, such that an adequate record could be developed to resolve this question.

¶ 60 As stated, where a defendant's claim of ineffective assistance of counsel is based on the failure to file a motion to suppress, the defendant must demonstrate prejudice by showing that the unargued suppression motion would have succeeded and that there is a reasonable probability that the trial outcome would have been different. *Henderson*, 2013 IL 114040, ¶¶ 12, 15. Our supreme court stated in *Henderson* that, with such a claim, "the record will frequently be incomplete or inadequate to evaluate that claim because the record was not created for that purpose." *Id.* ¶ 22.

¶ 61 In this case, there is no question that the trial would have resulted differently without the evidence seized from defendant's home, as that evidence formed almost the entirety of the State's case. Thus, the question is whether the motion to suppress would have been granted had defense counsel adequately raised and preserved the issue of whether the officers had probable cause to arrest defendant for being in the United States illegally. However, because counsel did not sufficiently raise the subject at trial, and based on appellate counsel's singular reliance on *Arizona*, the record is inadequate to evaluate this claim. As discussed, we do not know from the record whether the officers were relying on a civil or a criminal violation of immigration law, and *Arizona* additionally distinguished the situation before it from the type of federal-local law enforcement partnership that seemed to be present here. We are therefore unable to reach the merits of the issue. *Cf. People v. Gayden*, 2020 IL 123505, ¶¶ 29, 36 (record did not have sufficient information about the circumstances of the defendant's arrest from which the court could determine whether a motion to suppress would have been meritorious and therefore could not determine if the defendant was prejudiced by his trial counsel's failure to file a motion to suppress); *People v. Williamson*, 2018 IL App (3d) 150828, ¶ 30 (record was inadequate to evaluate ineffective assistance claim because there was no indication in the record as to why counsel abandoned the claim that there was not probable cause to search the defendant's vehicle and because the record was insufficient to determine whether the claim would have succeeded had counsel pursued it at the suppression hearing). In instances like this one, "the ineffective assistance claim may 'be better suited to collateral proceedings' " where the record may be adequately developed. *Williamson*, 2018 IL App (3d) 150828, ¶¶ 29, 34 (quoting *People v. Veach*, 2017 IL 120649, ¶ 46).

¶ 62                                                    III. CONCLUSION
¶ 63 For the reasons stated, we affirm the judgment of the Kane County circuit court.

¶ 64 Affirmed.