2025 IL App (1st) 231227-U

FIRST DISTRICT,
SIXTH DIVISION
January 24, 2025

No. 1-23-1227

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 CR 932902 |
| | ) | |
| KEVIN GAYDEN, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant, | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's convictions for first degree murder and attempt first degree murder where the evidence at trial was sufficient to support the jury's guilty verdicts and the trial court did not err by denying defendant's motion for mistrial.

¶ 2   Following a shooting on August 31, 2018, defendant Kevin Gayden was charged with the first degree murder of Jasmine Jackson (720 ILCS 5/9-1(a)(1)) and attempt first degree murder of Tyre Hardnick (720 ILCS 5/8-4(a); 720 ILCS 5/9-1(a)(1)). After separate but simultaneous jury trials with codefendant Edward Williams, the jury found Gayden guilty of both offenses, and found he was armed with a firearm during the commission of the offenses. The circuit court sentenced

Gayden to a total of 61 years' imprisonment. On appeal, Gayden contends: (1) he was not proven guilty beyond a reasonable doubt; and (2) the trial court erred in denying his motion for mistrial after a detective improperly identified Gayden in a surveillance photograph. We affirm.

¶ 3                                                    I. FACTS

¶ 4        Around 8:43 a.m. on August 31, 2018, Jackson and Hardnick were walking near 4412 W. West End Avenue in Chicago when two men emerged from an alleyway and gunshots rang out. Jackson was fatally shot in the head. Hardnick was hit in the left elbow. One of the men wore a grey sweatshirt. The other wore red pants. Hardnick saw the man in grey extending his arm towards him holding what he was "[p]retty sure *** was a gun," and Hardnick ran away. The shooters left the area in a white Nissan Versa rental car, registered to Williams. At approximately 5:00 p.m. that night, police officers stopped the white Nissan near 346 South Keeler and arrested Williams and his two passengers. Gayden was not in the car with them, but a print recovered from the inside handle of the rear driver-side door matched Gayden's fingerprint.

¶ 5        After the shooting, Hardnick went home, attended his cousin's funeral, and then went to the hospital for treatment. At the hospital, Hardnick told police two Black men shot at him. He did not identify either man.

¶ 6        On September 2, 2018, Hardnick met with Chicago Police Detective Rory O'Brien, who acted as a blind administrator of the photo arrays shown to Hardnick. Hardnick identified Brian Hall and Williams in separate photo arrays. When Hardnick identified Williams in one array, he stated, "I saw him there. I saw him, turned and heard shots." When he identified Hall in another array, Hardnick stated, "I don't recognize anybody. I've seen him *** in the neighborhood." Hardnick testified at trial he knew Hall "from the neighborhood." The State asked, "Did you recognize Brian Hall as one of the two men you saw emerge from the alley on August 31st, 2018?" Hardnick responded, "Yes." Thereafter, Hardnick repeatedly testified he did not recognize the man

in the red pants because he did not see his face.

¶ 7        The afternoon or evening following shooting, Gayden text messaged Hardnick, "[D]id you let Glow know that wasn't me, bro?" Hardnick responded, "[Y]eah, I cleared yo name." On cross-examination, Hardnick admitted he and Gayden have been friends since childhood—more than ten years.

¶ 8        The court admitted into evidence surveillance video from a nearby apartment complex at 4434 W. West End Avenue. One video shows Hardnick and Jackson walking together on a sidewalk. Jackson falls to the ground and Hardnick jumps over her and runs away across the street. An individual in a grey sweatshirt with the hood up runs past the area where Jackson fell and through a lawn. Additional surveillance videos show the man in the grey sweatshirt and the man in red pants running through a parking lot before getting into a parked white Nissan. The man in the grey sweatshirt enters the driver's seat, the man in the red pants gets into the rear driver's side seat, and the car drives away. Numerous other surveillance videos were admitted into evidence showing the man in grey and the man in red pants walking on sidewalks and the white Nissan driving and stopping on streets in the area shortly before the shooting.

¶ 9        Investigators recovered twelve fired cartridge casings from the alley. Forensic scientist Marc Pomerance determined that all twelve cartridge casings were nine-millimeter and fired by the same firearm. No firearm was recovered from the scene of the shooting.

¶ 10       Hall testified he talked to police officers at the station on September 1, 2018, but did not recall many of the questions they asked or answers he gave. Hall acknowledged that he "probably" identified Williams as B.B. in a mugshot photograph. He denied identifying Williams in a photo still from the surveillance video and said he did not know the "other guy" in the video.

¶ 11       Chicago Police Detective Ruben Weber testified about surveillance video footage and photo stills taken from the surveillance camera at Kenneth and W. West End Avenue. The State

showed Weber many photo stills at trial, including one where Weber identified "[t]he offenders from the homicide." The State also showed Weber a photo still of the individual in a grey hoodie and asked, "And is that – that was subsequently identified as Edward Williams?" Defense counsel objected to the question as leading. The trial court sustained the objection but Weber answered, "Yes, it was." Weber also identified "[t]he car that was used" in another still photo from the video, and identified "[t]he two defendants and the car." In the next photo, Weber identified, "[o]ne of the defendants running back to the car." Williams' counsel objected based on "improper testimony." The court overruled the objection. The State then asked, "Person running back to the car?" and Weber said, "Yes." For the next three photos, Weber stated, "Same thing." Finally, Weber identified another photo as a "[c]lose-up of defendant running back to the car." The trial court sustained the objection of Gayden's counsel "with regard to the characterization." Before cross-examining Weber, Williams' defense counsel moved for a mistrial, arguing "the detective was identifying the defendants on the video," which was "a violation of *Thompson*." Gayden's counsel did not join the motion or argue the court should take curative action. Later, however, after a break following Williams' counsel's cross-examination of Weber, Gayden's counsel requested to "join in on that motion" and stated, "Short of a mistrial, Judge, I would be asking that we strike the detective's testimony in its entirety." When the court gave counsel the opportunity to "argue the mistrial if that's what you want," counsel responded that he "didn't want to argue a mistrial" and asked to "strike the detective's testimony in its entirety."

¶ 12     The trial court denied Williams' motion for mistrial and found it would be "an extreme remedy" to strike all of Weber's testimony. Instead, the court offered to admonish the jury and said, "if you're asking that any reference the detective made with regard to his identification of the individuals in the photographs be stricken, again, if that is what you are asking." The court told counsel, "That's your call. I will do whatever you guys want." Gayden's counsel refused stating,

"I'm not asking it to be brought back up unless it happens again."

¶ 13    The State introduced into evidence four photographs from Gayden's Facebook page. One photograph uploaded on March 4, 2016, consists of Gayden in three poses wearing a black hooded sweatshirt with a True Religion brand logo on the chest. Another photo, uploaded on June 28, 2016, shows Gayden sitting in a car wearing the same hooded sweatshirt. The next photo, uploaded on December 19, 2017, shows Gayden standing in a parking lot wearing a red hooded sweatshirt with a True Religion logo on the chest and red Nike Air sneakers. The final photo, uploaded on December 19, 2017, shows Gayden standing in a convenience store wearing the red True Religion hooded sweatshirt, red sweatpants, and red Nike Air sneakers. After his arrest, Gayden admitted the photos from his Facebook page were him and confirmed that he was the only one who used the Facebook account. Gayden denied he was the man in the red pants in a still photo from the surveillance video.

¶ 14    FBI Special Agent Jeremy Bauer testified about his historical cell site analysis of Gayden's phone number. Bauer explained the purpose of historical cell site analysis is to "identify the cell sites that a particular phone used in order to approximate that phone's general location." He noted, "[I]t cannot specify with any degree of certainty to say a particular phone was at a particular address or a particular intersection, but it shows the general area a phone was in based upon its interactions with the cellular network." Bauer testified that Gayden's cell phone was used near the North Lawndale neighborhood at 8:22 a.m. The phone was used again at 8:38 a.m. near the scene of the shooting, 4412 W. West End Avenue, across Interstate 290 from North Lawndale. After the shooting, the phone returned across the Interstate to the Homan Square neighborhood and made a phone call at 9:01 a.m. Bauer concluded Gayden's phone was in the vicinity of the address of the shooting at the time of the shooting, which occurred at approximately 8:43 a.m.

¶ 15    Following closing arguments, the jury found Gayden guilty of first degree murder and

attempt first degree murder, and found he was armed with a firearm during the commission of the offenses. The trial court denied Gayden's motion for new trial. The court sentenced Gayden to a total of 61 years' imprisonment. Gayden does not challenge his sentence.

¶ 16                                    II. ANALYSIS

¶ 17        On appeal, Gayden argues: (1) he was not proven guilty of first degree murder and attempt first degree murder; and (2) the trial court erred in denying his motion for mistrial after Weber improperly identified him in a surveillance photograph.

¶ 18                               A. Sufficiency of Evidence

¶ 19        Gayden first argues the State did not prove him guilty of both offenses because "no eyewitness identified Gayden as being involved in the offense," and "scant circumstantial evidence," including his fingerprint, historical cell phone data, and Facebook photographs, was insufficient to prove him guilty beyond a reasonable doubt.

¶ 20        In reviewing the sufficiency of evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not the function of this court to retry Gayden or substitute our judgment for that of the jury on the weight given to the evidence or credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. This standard applies whether the evidence is direct or circumstantial, and circumstantial evidence alone may sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 21        On appeal, this court need not "search out all possible explanations consistent with innocence." *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). Nor must each piece of evidence satisfy the trier of fact beyond a reasonable doubt. *Jackson*, 232 Ill. 2d at 281. Instead, the trier of fact may consider all the evidence taken together. *Id.* "We will not reverse a conviction unless the

evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 22        To prove Gayden guilty of first degree murder and attempt first degree murder as charged, the State had to prove Gayden, or one for whom he was responsible, intentionally or knowingly shot and killed Jackson while armed with a firearm and shot Hardnick with a firearm with the intent to kill. 720 ILCS 5/9-1(a)(1), 5/8-4(a) (West 2018). The State had to prove beyond a reasonable doubt the identity of the individual who committed the offense, which may be established by circumstantial evidence. *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 36; *People v. Darrah*, 18 Ill. App. 3d 1018, 1022 (1974). Gayden does not challenge that the offenses were committed by the man in the grey sweatshirt and the man in the red pants. Instead, Gayden contends, "[N]o rational trier-of-fact could have found the evidence sufficient to prove Gayden's identity as the man in the red pants."

¶ 23        Supporting Gayden's identity and basis for conviction, the State points to the following evidence presented at trial: (1) surveillance video that depicted the man in the red pants from multiple angles; (2) a distinctive mark on the left hand of the man in the red pants which is "strikingly consistent" with the burn scar on Gayden's left hand; (3) photos from Gayden's Facebook page showing him wearing the "same Nike shoes and the same black True Religion hooded sweatshirt" as the man in the red pants; (4) Gayden's fingerprint lifted from the inside door handle of the white Nissan used to flee the scene of the shooting; and (5) historical cell site data that placed Gayden in the area of the shooting at the time of the shooting. All of this, the State argues, when viewed in favor of the prosecution on appeal, allowed a "reasonable trier of fact [to] have found [Gayden]'s identity proven beyond a reasonable doubt." We agree.

¶ 24        Gayden notes there were no eyewitnesses who identified him. He also points out that Hardnick, his friend since childhood, "made a positive identification of Williams," not him.

Gayden also argues the evidence "failed to distinguish Gayden from any number of other people who would have been present in the neighborhood" at the time of the shooting. Specifically, there was only a single fingerprint from Gayden found in the car; the Facebook photos depict Gayden wearing clothing that is "popular among people in [his] demographic"; the historical cell site data did not establish his "physical location at any particular time": and "nothing distinctive can be seen" in the surveillance video and photos.

¶ 25        While Gayden attempts to reanalyze each piece of evidence individually, we must examine "*all of the evidence* in the light most favorable to the prosecution" and decide whether it could support a finding of guilt beyond a reasonable doubt. (Emphasis added.) *Wheeler*, 226 Ill. 2d at 117. In this case, we find that the evidence in this case was not "so improbable, unsatisfactory, or inconclusive" that it creates a reasonable doubt of Gayden's guilt. See *Collins*, 214 Ill. 2d at 217.

¶ 26        In response to the State's evidence of identification, Gayden argues he was not identified as the man in the red pants involved in the shooting. However, such direct identification is not required to prove guilt beyond a reasonable doubt. Instead, identity may be proven by circumstantial evidence. *Darrah*, 18 Ill. App. 3d at 1022.

¶ 27        True, Hardnick never named Gayden, as he did with Williams. But Hardnick and Gayden were friends since childhood and exchanged text messages shortly after the shooting. In their text exchange, Gayden asks, "[D]id you let Glow know that wasn't me, bro?" Hardnick responds, "[Y]eah, I cleared yo name." This text exchange is subject to multiple interpretations. While Gayden classifies it as "friendly," the State reads it as Gayden attempting to conceal his involvement in the shooting. It was within the province of the jury to observe Hardnick's testimony, compare it with other evidence, and consider his relationship with Gayden. It is reasonable for the jury to believe Hardnick was dishonestly shielding a friend, which helps support a finding that Gayden was guilty beyond a reasonable doubt.

¶ 28    As to Gayden's fingerprint found inside Williams' rental car, we agree that a single fingerprint does not, by itself, constitute proof beyond a reasonable doubt. However, the State produced much more than this, which led the jury to believe Gayden is the man in the red pants at the scene of the shooting. Gayden's fingerprint was found on the inside handle of the white Nissan's rear driver-side door—the same door the man in the red pants entered immediately after the shooting. Williams rented the car on August 17, 2018, just two weeks before the shooting, leaving relatively few other opportunities for Gayden to use the rear door handle.

¶ 29    The historical cell site analysis shows that Gayden's cell phone was near 4412 W. West End Avenue at the timing of the shooting and left the scene shortly after. This, coupled with the movement of the white Nissan captured on surveillance video, could reasonably lead the jury to infer that Gayden was with his cell phone in the area at the time of the shooting. Further, Gayden's Facebook photographs show him wearing the same shoes, same hooded sweatshirt, and same type of clothing as the man in the red pants in the surveillance video. While not conclusive, the jury could draw the reasonable inference that Gayden still owned and wore the clothing depicted on Facebook on the day of the shooting.

¶ 30    In response to the State's evidence of a distinctive mark on Gayden's left hand consistent with that of the man in the red pants, Gayden argues "nothing distinctive can be seen" in the surveillance video that would allow the jury to identity him as the man in the red pants. Five photo stills from the surveillance video depicting the man in the red pants were admitted into evidence. In three of the photos, the man's left hand is concealed in the sleeve of his hooded sweatshirt. In two other photos, the man's left hand is exposed and shown close-up. The State identifies "a light-colored, shiny patch of skin that is most pronounced on the knuckle of his index finger, but extends up his thumb, index, and middle fingers" on the man's hand. Gayden maintains that the still photos are "too blurry and pixilated" to show the mark "with any clarity." However, it was within the

jury's province to compare the photo stills with the burn scar on Gayden's left hand and draw reasonable inferences therefrom.

¶ 31    Finally, Gayden argues Hardnick provided "evidence of another person's involvement: Brian Hall," which undermines the State's case against him. Not so. Hardnick repeatedly stated that he did not recognize the man in the red pants. When he initially viewed the photo array at the police station on September 2, 2018, Hardnick identified Hall but stated, "I don't recognize anybody. I've seen him *** in the neighborhood." Later that day, Hardnick was shown a photo still from the surveillance video of the man in the red pants and wrote on the photo, "I don't recognize him." During cross-examination at trial, Hardnick testified that he "didn't see any face" and "just saw the clothing" of the man in the red pants. During cross-examination, Hardnick confirmed that he told police he "didn't recognize who the person in the red pants was."

¶ 32    At trial, Hardnick testified he identified Hall in a photo array because he knew him "from the neighborhood." The State then asked, "Did you recognize Brian Hall as one of the two men you saw emerge from the alley on August 31st, 2018?" Hardnick responded, "Yes." The State claims this was a "misstated answer," but did nothing to correct it at trial. Aside from this one question and answer, Hardnick never identified Hall as one of the men present near the shooting. It was up to the jury, as trier of fact, to resolve discrepancies in the testimony, and it was " 'free to accept or reject as much or as little of a witness's testimony as it please[d].' " *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (quoting *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22).

¶ 33    Importantly, the jury was presented with and implicitly rejected Gayden's argument at trial. During closing argument, Gayden's counsel called attention to Hardnick's testimony: "[Y]ou had one person to [*sic*] come in here and tell you who was the person in the red pants, what did that one person tell you, we know what he said on August 31st of 2018, about 5:00 o'clock via text message. No, it wasn't you, I cleared your name." Gayden's counsel continued, "Mr. Hardnick,

what did he say two days later, in a police station? I don't know who that is in the red pants." Counsel then suggested to the jury that Hall was "the third person in the car" at the time of the shooting. Notwithstanding this argument, the jury found Gayden guilty. After considering the entire record in the light most favorable to the prosecution, we conclude a rational jury could have found Gayden was the man in the red pants and, thus, found him guilty beyond a reasonable doubt.

¶ 34                                                    B. Mistrial

¶ 35          Gayden claims that the trial court should have granted his motion for mistrial after Weber "supplied his own identification evidence, despite having no personal knowledge of the defendants and being in no better position to identify them than members of the jury." Gayden admits he did not fully preserve the objection to Weber's testimony. Nonetheless, Gayden asks us to review this issue under plain error and grant him a new trial. We find Gayden's claim is barred by forfeiture where he never moved for mistrial or preserved an objection to Weber's testimony.

¶ 36          The propriety of declaring a mistrial is within the broad discretion of the trial court. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial." *People v. Redd*, 135 Ill. 2d 252, 323 (1990). "To prevail on appeal, [the] defendant must establish that there was a manifest necessity for the mistrial or that the ends of justice would be defeated by continuance of the trial, that is, that the jury was so influenced and prejudiced that it would not, or could not, be fair and impartial, and the damaging effect of the evidence could not be remedied by admonitions or instructions." *People v. Wills*, 153 Ill. App. 3d 328, 339-40 (1987). A trial court's denial of a motion for a mistrial will not be disturbed on review unless there has been an abuse of discretion. *Nelson*, 235 Ill. 2d at 435.

¶ 37          The record reflects that Gayden's defense counsel never specifically requested a mistrial based on Weber's testimony. Williams' counsel moved immediately for mistrial after Weber's

identification testimony. Gayden's counsel did not. However, after cross-examination by Williams' counsel and a break, Gayden's counsel asked to "join in on" Williams' motion. The court then instructed counsel to "argue the mistrial if that's what you want." Counsel responded he "didn't want to argue a mistrial." Instead, he said, "Short of a mistrial, I am just asking that this witness' testimony be stricken. I think that's appropriate." Later, immediately before closing arguments, Gayden's counsel referred to "another issue with regard to Detective Weber's statement" and noted, "I made my motion with regard to striking his testimony, I think that stays and the court has ruled." Counsel made no mention of mistrial.

¶ 38        To preserve an issue for appellate review, a defendant must raise the issue before the trial court and in a posttrial motion. *People v. Colyar*, 2013 IL 111835, ¶ 27. If a defendant fails to do so, he forfeits review of the issue. *People v. Thompson*, 238 Ill. 2d 598, 612 (2010).

¶ 39        In his reply brief, Gayden admits he did not fully preserve the objection to Weber's testimony and does not respond to the State's contention that his counsel never asked the court to grant mistrial. He further acknowledges he forfeited review by not including his claim of error in a post-trial motion. Nonetheless, he urges us to review his claim under the doctrine of plain error. However, "the plain-error doctrine does not apply in cases that involve invited error." *People v. Gibson*, 2021 IL App (1st) 190137, ¶ 16. Such is the case here.

¶ 40        Under the doctrine of invited error, a party is prevented from " 'complaining of error which that party induced the court to make or to which that party consented.' " *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 26 (quoting *In re Detention Swope*, 213 Ill. 2d 210, 217 (2004)). Here, after denying Williams' motion for mistrial, the trial court addressed Gayden's objections to Weber's testimony and offered to "admonish the jury *** that any reference the detective made with regard to his identification of the individuals in the photographs should be stricken." Gayden's attorney rejected the trial court's offer to strike Weber's identification testimony or issue a curative

instruction and said, "I'm not asking it to be brought back up."

¶ 41    Illinois courts have long recognized the effect of a curative instruction. The prompt sustaining of an objection combined with a limiting instruction to the jury is often sufficient to cure an evidentiary error. See *People v. Risper*, 2015 IL App (1st) 130993, ¶ 46. In *People v. Thompson*, our supreme court suggested trial courts provide an instruction to the jury "that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed," in order to "lessen any concerns regarding invading the province of the jury or usurping its function." *Thompson*, 2016 IL 118667, ¶ 59. "The jury is presumed to follow the instructions given to it by the court." *People v. Fields*, 135 Ill. 2d 18, 53 (1990).

¶ 42    Here, after objecting once to Weber's identification testimony, Gayden's counsel did not initially join Williams' motion for mistrial. Later, after a break following Williams' counsel's cross-examination of Weber, Gayden's counsel "join[ed] in on [Williams'] motion." When the court gave counsel the opportunity to "argue the mistrial if that's what you want," counsel responded that he "didn't want to argue a mistrial" and asked to "strike the detective's testimony in its entirety."

¶ 43    The decision to decline a limiting instruction is a valid trial strategy to avoid "drawing undue attention" to the objected-to evidence. *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52. A party cannot reject a curative instruction and then rely on the absence of that instruction to claim error. See, *e.g.*, *People v. Green*, 2022 IL App (1st) 181664-U, ¶ 59 (citing *People v. Montes*, 2020 IL App (2d) 180565, ¶ 45) (defendant invited the error where he rejected a curative instruction to disregard the contested testimony). In this case, defense counsel rejected the court's offers to admonish the jury and strike Weber's testimony "with regard to his identification of the individuals in the photograph." Gayden cannot now claim error where he refused an instruction that would

have alleviated the concern of Weber's testimony "invading the province of the jury or usurping its function." *Thompson*, 2016 IL 118667, ¶ 59. This is particularly so given the other evidence presented at trial that casts no doubt on the fact Gayden was the person in the red pants emerging from the alley.

¶ 44    As explained above in detail, Gayden's fingerprint was lifted from the same door of the white Nissan the man in the red pants was shown on video entering. A distinctive mark on the left hand of the man in the red pants is similar to a mark on Gayden's left hand. Photos from Gayden's Facebook page show him wearing the same shoes and sweatshirt as the man in the red pants. Historical cell site data also places Gayden near the shooting at the time of the shooting. Because no clear or obvious error occurred and the evidence of Gayden's identity is not so closely balanced to tip the scales of justice, we decline to review Gayden's claim for mistrial under the doctrine of plain error.

¶ 45                                    III. CONCLUSION

¶ 46    After reviewing the record and considering all the evidence in the light most favorable to the prosecution, we cannot say no rational factfinder could have found the essential elements of the crimes beyond a reasonable doubt. Further, we decline to reverse and provide a new trial where Gayden's counsel had the opportunity to cure any prejudice related to Weber's testimony but decided not to, did not raise the issue in a posttrial motion, forfeited it on review, and the plain-error doctrine does not apply. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 47    Affirmed.